**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|                                              |   |                            |
|----------------------------------------------|---|----------------------------|
| **Wendy K. DaCosta,**                        | : |                            |
|          **Plaintiff**                       | : | **CASE 3:12-CV-01011-RNC** |
|                                              | : |                            |
| **v.**                                       | : |                            |
|                                              | : |                            |
| **City of Danbury, Mark Boughton, In**       | : |                            |
| **His Individual Capacity**                  | : |                            |
|          **Defendants**                      | : | **October 2, 2014**        |
|                                              | : |                            |

## THIRD AMENDED COMPLAINT

Wendy K. DaCosta, ("DaCosta") by and through her attorneys, Maurer &

Associates, PC, hereby states and affirms her complaint against the City of Danbury

and Mark Boughton, in his individual capacity.

## NATURE OF THE ACTION

This is an action under 42 U.S.C. §1983 alleging denial of due process and

deprivation of the equal protection of the laws pursuant to the Fourteenth

Amendment to the Constitution and laws of the United States.

This case also brings causes of action pursuant to 29 U.S.C. § 2611 (4) (A)

(iii), alleging violations of DaCosta's rights under the Family and Medical Leave Act.

Finally, this case sounds in common law defamation.

By this action DaCosta seeks the following relief: (1) compensatory damages pursuant to 42 U.S.C. §1988, (2) reasonable attorney's fees, (3) costs, (4) pre and post judgment interest, (4) a permanent Injunction ordering the Defendant City of Danbury to reinstate DaCosta to her previous position with lost pay, benefits and seniority; (5) Compensatory damages for emotional distress, damage to her reputation and professional standing; (6) Punitive damages against Mayor Mark Boughton in his individual capacity; (7) Compensatory damages pursuant to FMLA 29 U.S.C. § 2601 et seq. for all past, present and future lost wages and employment benefits; (8)Reasonable attorney's fees pursuant to the FMLA, 29 U.S.C. § 2617(a); (9) Attorney's fees pursuant to 42 U.S.C. §1988; (10) an order that the Plaintiff is entitled to a name-clearing hearing to refute the untrue and damaging accusations against her; and (11) such other and further relief that the Court finds just and reasonable.

## <u>JURISDICTION</u>

1. This action is brought pursuant to 42 U.S.C. §1983.

2. Jurisdiction is founded upon 28 U.S.C. §1331, 28 U.S.C. §1343(a) and 28

U.S.C. §1367(a).

3. All of the allegations made herein occurred within the territorial jurisdiction of the United States District Court for the District of Connecticut.

**PARTIES**

4. Plaintiff, Wendy K. DaCosta ("DaCosta") was and is a resident of the City of Danbury, Connecticut.

5. Defendant, the City of Danbury (the "City") is a municipality established in accordance with the laws of the State of Connecticut   including the Revised Charter of the City of Danbury approved by the electors of the City of Danbury on November 6, 1990 (the "Charter").  A true and accurate copy of sections 2.16.1 adopting the merit system, Sec. 4-2 the duties of the Mayor and sec. 6-3 regarding the appointment of city employees is attached as Exhibit "A".

6. Further, the City, pursuant to Sec. 2-16.1 of the Charter has adopted the state statues embodying the "merit system."

7. Defendant, Mark Boughton ("Boughton," or the "Mayor"), was at all times relevant, the Mayor of the City.

8. At all relevant times, the Mayor acted as the agent and a final policymaker for

the City regarding employee management practices and policies and was subject to the same rules of employee conduct as other City employees.

9. The Mayor, as pursuant to Section 4-1 of the Charter, "shall take care that all laws and ordinances governing the City are faithfully executed."

10. The Mayor is and was at all relevant times the final policy-maker for the City in regard to the enforcement of City rules of employee conduct and, as such, his specific directives as to enforcement of City rules of employee conduct constitute the policies of the City.

## FACTS

11. City employees were and are governed by Sections 2-16.1 and 6-3 of the Charter and the Civil Service Rules and Regulations, City of Danbury, dated January 28, 2000 (hereafter, "CSRR"). A true and accurate copy of the CSRR is attached as Exhibit "B".

12. Section 6-3 of the Charter states, "All City officers and employees when not otherwise specified in the Charter may be subject to the rules and regulations adopted pursuant to the merit system as the same may be in effect in the City." Charter, §6-3.

13. Section 2, ¶ 12 of the CSRR defines the term "Classified Service" as, "all non-elective employees and officers employed by the City of Danbury, except employees of the Danbury Board of Education." CSRR §2.12.

14. Section 8, ¶ D of the CSRR states in relevant part, "No removal from the classified service, except at the expiration of the period of probation, shall be made by the Mayor except for just cause."

15. On January 5, 2004, DaCosta was hired by the City as a part-time temporary clerk in the Building Department.

16. On April 5, 2004, DaCosta was appointed to the full-time position of Executive Secretary to the Mayor. On or before April 5, 2005, DaCosta completed her probationary period and became a permanent employee. As a permanent employee, she could only be terminated by the Mayor and for "Just Cause". Id.

17. Non-Union city employees are also governed by the Personnel Handbook for Non-Union Employees ("Non-Union Handbook") which incorporates specifically the City Policies regarding Anti-Harassment, Family & Medical Leave, Progressive Discipline, and  Complaint Procedure. A true and

accurate copy of relevant provisions of the Personnel Handbook for Non-Union Employees is attached as Exhibit "C".

18. As an employee of the City, DaCosta is subject to the Progressive Discipline Policy. See Exhibit "C" at FOIA pg. 80-83. The policy describes the City's "intention to apply such action in a fair and equitable manner." Further, the policy states that "In administering disciplinary action, consideration will be given to due process of law" and limits termination to incidents of "gross misconduct or no improvement after a suspension" and requires a "hearing." Only when an employee is "disruptive in the workplace" may immediate action be taken, and then the employee should be suspended pending investigation." See: Exhibit "C" at FOIA pg. 80 at "Policy Statement", 81 at "d. Termination"

19. During 2007 and 2008, DaCosta was involved in a consensual personal relationship with a co-worker, Antonio Iadarola, Director of Public Works for the City ("Iadarola"). A consensual sexual relationship between persons who do not work in the same department, even where one is the head of the department and the other is at a secretarial level, is specifically excepted

from the City's Anti-Harassment Policy. See: Exhibit "C" at A.4. c., numbered FOIA pg. 45.

20. In early 2008, the personal relationship between DaCosta and Iadarola ended. DaCosta and Iadarola continued to communicate from time to time by mutual agreement both in and out of the work place.

21. On April 21, 2008, the Mayor and Virginia Alosco-Werner ("Alosco-Werner"), Director of Human Resources for the City, verbally counseled DaCosta regarding a harassment complaint they had received from Iadarola alleging that DaCosta had been calling and sending text messages to him. The Mayor and Alosco-Werner instructed DaCosta to cease communicating with, calling and sending messages to Iadarola.

22. DaCosta's alleged conduct in calling or texting Iadarola does not violate the City's Anti-Harassment Policy, in that said conduct is neither a request for sexual favors in exchange for a job benefit nor creating a hostile work environment.  See: Exhibit "C" at A.3. c, numbered FOIA pg. 44. Further, as none of the asserted conduct took place during working hours or on City property it is also outside the policy.

23. It is inherently unjust, arbitrary and capricious to discipline a person for conduct that is outside the scope of any City policy, violates no law, and does not materially interfere with the person's performance.

24. Following and notwithstanding the April 21, 2008 disciplinary counseling, DaCosta was required to communicate with Iadarola for work related matters. The Mayor and Alosco-Werner required this communication.

25. On August 28, 2008, the Mayor and Alosco-Werner conducted a formal disciplinary counseling session with DaCosta regarding her difficulty in working with some staff members and her alleged inappropriate behavior at a staff meeting on August 26, 2008. DaCosta was instructed in relevant part as follows:

> A. "effective immediately, you will conduct yourself in a professional manner and will not discuss business-related issues with those who are not involved in such matters;" Boughton Memorandum August 29, 2008, P.2.
>
> B. "You will maintain a respectful tone with all staff and ensure that you represent this office and the City of Danbury in a positive manner." Id.

C.  "You will also take the necessary steps in order to provide continual productive, effective and efficient administrative functions for the office." Id.

D.  "should issues or questions arise, you will discuss such matters with me in an appropriate manner." Id.

E.  "if another conversation such as this were required, it would result in your separation of employment. However, it is my hope that immediate improvement will occur and we will continue to have a successful working relationship." Id.

26. At no time during the August 28, 2008 counseling session was Iadarola discussed or was DaCosta instructed not to have contact with Iadarola.

27. The alleged inappropriate behavior for which DaCosta was counseled was DaCosta's vocal opposition to a change in work schedule which was announced at the staff meeting in question.

28. Following the August 28, 2008 counseling session and notwithstanding the April 21, 2008 disciplinary counseling session, DaCosta was required to communicate with Iadarola for work related matters. The Mayor and Alosco-Werner were aware of and required this communication.

29. Following the August 28, 2008 counseling session and notwithstanding the April 21, 2008 disciplinary counseling session, DaCosta was required to attend work-related social events that Iadarola also attended. The Mayor and Alosco-Werner were aware that DaCosta and Iadarola both attended these events.

30. Following the August 28, 2008 counseling session and notwithstanding the April 21, 2008 disciplinary counseling session, Iadarola communicated with DaCosta from time to time on a social basis, including a twenty eight minute telephone conversation on June 20, 2009 in which Iadarola participated willingly.

31. Iadarola's willing participation in social conversations led DaCosta to reasonably believe that he did not object to hearing from her then or in the future.

32. On August 18, 2009, only eight weeks after Iadarola's lengthy telephone conversation with DaCosta, Alosco-Werner issued a written disciplinary counseling letter to DaCosta purportedly in response to a complaint from Iadarola about an exchange of two text messages with DaCosta outside of work, on August 6, 2009. Id.

33. The August 18, 2009 disciplinary counseling letter from Alosco-Werner warned DaCosta as follows:

A. DaCosta was suspended from work without pay from August 18, 2009 through August 23, 2009; Alosco-Werner Letter, August 18, 2009, P.1.

B. As a condition of DaCosta's continued employment, she was instructed to contact the City's Employee Assistance Program (EAP) by August 21, 2009 and to comply with all parts and components of the EAP program; Id.

C. DaCosta was ordered to, "cease contact with the complainant referred to in the above paragraphs" (Iadarola); Id.

D. "effective immediately, you will conduct yourself in a professional manner and will not discuss business-related issues with those who are not involved in such matters;" Id.

E. "you will maintain a respectful tone with all staff and ensure that you represent the City of Danbury in a positive manner." Id at P. 1-2.

F. "Furthermore, your work performance must be continually productive, effective and efficient." Id at 2.

34. DaCosta's alleged conduct in texting Iadarola does not violate the City's Anti-Harassment Policy, in that is neither a request for sexual favors in exchange for a job benefit nor creating a hostile work environment. See: Exhibit "C" at A.3. c, numbered FOIA pg. 44. Further, as none of the asserted conduct took place during working hours or on City property it is also outside the policy.

35. It is inherently unjust, arbitrary and capricious to discipline a person for conduct that is outside the scope of any City policy, violates no law, and does not materially interfere with the person's performance.

36. DaCosta was not afforded prior notice or an opportunity to be heard or to present evidence with regard to the August 18, 2009 disciplinary action.

37. DaCosta contacted the City's Employee Assistance Program (EAP) before August 21, 2009 and promptly complied with the EAP's program including attending employer mandated counseling sessions.

38. On August 18, 2009, DaCosta signed an "Authorization to Release Information" provided by the EAP representative stating that DaCosta's

consent to the EAP program was required for, "no longer than one year." The

form further stated that DaCosta's consent to the EAP expired February

2009. Authorization to Release Information Form, 8/18/2009.[1]

39. Notwithstanding the August 18, 2009 order to cease all contact with Iadarola,

   DaCosta was subsequently required to communicate with Iadarola at work

   and at work-related social events in the presence of and with the knowledge

   and approval of the Mayor and Alosco-Werner.

40. DaCosta socialized with Iadarola and other co-workers in the presence of the

   Mayor on March 31, 2011 and on June 10, 2011.

41. The Mayor's conduct in both implicitly and directly approving the social and

   work-related contact between DaCosta and Iadarola created a policy that

   allowed contact and communication between DaCosta and Iadarola and

   rescinded the earlier prohibition on contact as of March 31, 2011.

42. On the evening of August 12, 2011, DaCosta was informed by a male

   acquaintance that he intended to call Iadarola and berate him for his rude

   behavior toward DaCosta.

---

[1] Apparently, the form misstates the year, as the form was signed in August 2009, so the intended expiration date was February 2011.

43. Despite her best efforts, Plaintiff could not dissuade the acquaintance from calling Iadarola. She did not encourage or instruct him to call Iadarola nor did she provide Iadarola's phone number.

44. Concerned that such a call might upset Iadarola, and in accordance with the Mayor's policy permitting her to contact Iadarola, DaCosta called to warn him and to tell him to disregard the acquaintance's call.

45. On August 18, 2011, DaCosta delivered in-hand to Alosco-Werner a written and signed request for medical leave to seek treatment for a serious health condition under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq. This request included a signed letter from MCCA, a local addiction treatment provider, stating that DaCosta had scheduled an evaluation for substance abuse treatment. Alosco-Werner rejected DaCosta's request for FMLA leave without consideration, hearing or review.

46. On August 18, 2011, after DaCosta had delivered the request for FMLA leave, Alosco-Werner sent a uniformed officer from the Danbury Police Department to DaCosta's home to deliver a letter terminating DaCosta's employment with the City.

47. The termination letter dated August 18, 2011 and signed by the Mayor (hereinafter, "Termination Letter") stated that DaCosta's employment with the City was being terminated based upon a report from Human Resources regarding the incident of August 12, 2011.

48. The termination letter further stated that DaCosta's employment was being terminated for a, "continued course of misconduct and inappropriate behavior."

49. Although DaCosta was interviewed regarding the August 12, 2011 incident by Alosco-Werner, DaCosta was not afforded prior notice, representation, and an opportunity to be heard or to present evidence with regard to the termination by the Mayor and Alosco-Werner.

50. The Human Resources report to the Mayor dated August 17, 2011, written by Alosco-Werner and captioned, "Recommendation for Termination-Wendy DaCosta," (hereafter, "Termination Report") contains multiple errors of fact including the following:

   A.  The Termination Report states: "On August 29, 2008…Ms. DaCosta received another warning regarding her…failure to follow your directives regarding contacting Mr. Iadarola." This

statement is factually incorrect. The August 28, 2008 counseling session involved alleged misbehavior at a staff meeting not her contact with Iadarola.

B.  The Termination Report further states: "On August 29, 2008…It was clearly stated that any further inappropriate behavior or contact with Mr. Iadarola would result in her separation of employment." This statement is factually incorrect because the August 28, 2008 counseling session involved alleged misbehavior at a staff meeting not her contact with Iadarola. Id.

C.  The Termination Report further states: "Ms. DaCosta's involvement in the threatening phone call made to Mr. Iadarola as well as her continued calls to him on this date, created a threatening and hostile environment for Mr. Iadarola." This statement is factually incorrect. DaCosta did not participate in or instigate a threatening phone call to Iadarola. She attempted to prevent such a call and her call to warn him could not reasonably be construed to threaten Iadarola. Its express purpose was to forewarn him and to reduce any surprise or

alarm that may have resulted from an unexpected call from DaCosta's acquaintance. Id.

D.  The Termination Report further states: "Ms. DaCosta…violated the terms of her action plan." This statement is factually incorrect. At the time of the termination, the prior action plan had expired by the terms of the EAP documents. Additionally, DaCosta's actions on August 12, 2011 did not in fact violate the terms of her EAP action plan. Further, the Mayor had enacted a specific policy as to DaCosta and Iadarola permitting both social contact and work-related contact between the two employees. DaCosta could not violate a policy that had been rescinded by the employer's subsequent policies and practices enacted by the Mayor. Id.

E.  The Termination Report further states: "Ms. DaCosta…violated the City of Danbury Anti-Harassment Policy." This statement is factually incorrect. The City's Anti-Harassment Policy does not contain any prohibition against the type of out-of work conduct DaCosta engaged in on August 12, 2011. Her conduct in

warning Iadarola could not reasonably be interpreted as hostile or harassing. Id.

51. The City's Policies, the Non-Union Employees' Handbook, the CSRR, and the Charter as described above, create a reasonable expectation of and entitlement to employment with the City in DaCosta.

52. That reasonable expectation and entitlement to employment by the City is a property interest protected by the 14th Amendment to the Constitution of the United States.

53. These policies also create for every non-elected employee of the City including DaCosta a reasonable expectation of the fair and equitable administration of these policies.

54. It is inherently unjust, arbitrary and capricious to discipline a person for conduct that is outside the scope of any City policy, violates no law, and does not materially interfere with the person's performance.

55. DaCosta has been treated differently than male City employees regarding discipline and termination of employment with the City.

56. DaCosta has been disciplined and terminated for conduct that does not violate the City's policies in a manner that does violate those policies.

57. Male employees have been accused of violations of the City's anti-harassment policies and have either not been disciplined or were disciplined less severely than DaCosta. DaCosta has been denied a hearing to show that this termination is without "just cause" and to clear her name.

58. During the course of DaCosta's termination and its aftermath, the Mayor and other town officials have published malicious, false and defamatory statements regarding DaCosta's character and conduct which have caused harm to her personal and professional reputation in the community, emotional distress, and economic loss.

### AS AND FOR A FIRST CAUSE OF ACTION
**(42 U.S.C. §1983 Due Process Violation
by Mark Boughton in his official capacity)**

1-59. The allegations of paragraphs 1-59 of this Complaint are hereby incorporated by reference as if fully set forth here.

59. At all relevant times, Mark Boughton in his official capacity as Mayor of the City of Danbury was a "person" acting under color of state law for purposes of 42 U.S.C. §1983.

60. At all relevant times, the Mayor had final policy-making authority with respect to the discipline and discharge of City employees including DaCosta.

61. As final policy-maker for the City, the actions of the Mayor as set forth above are the City's policies regarding discipline and discharge of employees.

62. City employees were and are governed by City Ordinance Section 2-16.1 and  Section 6-3 of the Charter and the Civil Service Rules and Regulations, City of Danbury, dated January 28, 2000 (hereafter,  "CSRR"). A true and accurate copy of the CSRR is attached as Exhibit "B".

63. Section 6-3 of the Charter states, "All City officers and employees when not otherwise specified in the Charter may be subject to the rules and regulations adopted pursuant to the merit system as the same may be in effect in the City."  Charter, §6-3.

64. The portion of Section 6-3 of the Charter which states, "as the same may be in effect in the City" limits the City's discretion in applying the Civil Service rules to the precise rules as they are written in the CSRR.

65. Section 2, ¶ 12 of the CSRR precisely defines the term "Classified Service" as, "all non-elective employees and officers employed by the City of Danbury, except employees of the Danbury Board of Education." CSRR §2.12.

66. Further, Section VII.4.E of the CSRR provides that the Classified Service in the City includes some positions which are non-competitive and are therefore exempt from the civil service competitive testing procedures.

67. Section 8, ¶ D of the CSRR states in relevant part, "No removal from the classified service, except at the expiration of the period of probation, shall be made by the Mayor except for just cause."

68. DaCosta was at all relevant times a non-elective employee of the City and was not employed by the Danbury Board of Education.

69. DaCosta is a member of the Classified Service as she is a non-elective employee of the City not employed by the Danbury Board of Education, established by Section 6.3 of the Charter, and Section 2, ¶ 12 of the Civil Service Rules and Regulations (hereafter, "CSRR").

70. As a member of the Classified Service, DaCosta cannot be removed from her position except for "just cause."

71. DaCosta has a property interest in her job with the City created by her status as a member of the Classified Service, creating a legitimate expectation and right not to be fired without "just cause" established by the Charter, the Connecticut General Statutes, and the CSRR.

72. DaCosta is further entitled to "just cause" termination by the City's Anti-Harassment and Progressive Discipline policies contained in the Non-Union Employee Handbook ("NUEHB").

73. The Anti-Harassment and Progressive Discipline Policies guarantee DaCosta "just cause" employment by providing that no termination for Anti-Harassment or disciplinary matters which do not involve "serious rule violations or serious improper conduct," will result in termination without a scheduled hearing. The Policy Statement Section of the NUEHB states that the Progressive Discipline Policies may be suspended only in a case of "serious rule violations or serious improper conduct."

74. These provisions of the NUEHB guarantee non-union City employees the right to these progressive discipline procedures unless the offense involves "serious rule violations or serious improper conduct."

75. The alleged harassment for which DaCosta was terminated did not involve "serious rule violations or serious improper conduct," and therefore DaCosta should have been afforded Progressive Discipline prior to termination under the NUEHB.

76. Sections 2.C and 2.D of the Progressive Discipline Policy specifies that when Personnel is recommending any City employee for suspension or termination, they must "schedule a hearing." When DaCosta was suspended and when she was terminated she was not provided with a hearing "scheduled" by Personnel as set forth in the Progressive Discipline Policy of the NUEHB.

77. The guarantee of a scheduled hearing implies some notice and an opportunity for the employee to present evidence on her behalf and to have that evidence considered fairly.

78. The guarantee of a scheduled hearing implies a guarantee of a fair adjudication of an alleged infraction.

79. The guarantee of a fairly adjudicated scheduled hearing guarantees "just cause" employment because a fairly adjudicated hearing after notice and an opportunity to present evidence will by definition provide a "just cause" determination prior to termination.

80. The Mayor has deprived DaCosta of her protected property interest in her employment without due process of law by terminating DaCosta's employment and depriving her of pay and benefits without notice or a

scheduled hearing. DaCosta has a right to notice and a scheduled hearing prior to termination pursuant to (a) the "just cause" guarantee in the CSRR; (b) the Progressive Disciplinary Policy incorporated into the NUEHB; and (c) the Anti-Harassment Policy incorporated in the NUEHB.

81. The City has deprived DaCosta of her job without procedural due process in that it refused to provide her notice and the scheduled hearing guaranteed d in the Non- Union Employees Handbook and further, refused to provide her with the procedures, including a scheduled hearing, to which all City employees are entitled under the Anti-Harassment Policy, which is incorporated into the Non-Union Handbook and which allegedly provided the basis of DaCosta's termination.

82. The City further deprived DaCosta of the following procedures to which she was entitled under the Anti-Harassment Policy:

       A.  Sec. E 2 (a);

       B.  Sec. F 1;

       C.  Sec. F 3;

       D.  Sec. F 5;

       E.  Sec. F 8;

F.  Sec. F 9.

83. Boughton knew or should have known that terminating DaCosta for conduct that was not prohibited by the City's Anti-Harassment Policy, took place on her personal time and off City property was not "just" as required by the CSRR, the Non-Union Employees Handbook, the Anti-Harassment Policy and the Progressive Discipline Policy.

84. Boughton knew or should have known that the CSRR defines classified service to include DaCosta as set forth hereinabove.

85. Boughton knew or should have known that the Progressive Discipline Policy required a scheduled hearing prior to termination or suspension of DaCosta.

86. Boughton knew or should have known that Alosco-Werner's "investigation" into the alleged misconduct of DaCosta on August 12, 2011 consisted of two phone calls to warn Iadarola of her friend's rude phone call so that he would not be alarmed.

87. Boughton knew or should have known that two phone calls from DaCosta to warn Iadarola of her friend's rude phone call so that he would not be alarmed, during off duty hours, does not involve, "serious rule violations or serious improper conduct."

88. In 2010, when DaCosta was terminated, the law regarding sexual harassment and "just cause" termination for classified civil service employees such as DaCosta was clear and well known.

89. As a result of the City's actions, DaCosta has been deprived of her job, pay, benefits, and her good reputation and is entitled to compensation therefore.

90. As a result of the City's actions, DaCosta is entitled to a mandatory injunction requiring the City to nullify the termination of her employment, to reinstate her to her previous position, and to empty her personnel file of all reports of misconduct.

### AS AND FOR A SECOND CAUSE OF ACTION
**(42 U.S.C. §1983 Due Process Violation by Mark Boughton in his Individual Capacity)**

1-91. The allegations of paragraphs 1-90 of this Complaint are hereby incorporated by reference as if fully set forth herein.

91. At all relevant times herein, Mark D. Boughton, acting in his individual capacity, ("Boughton") was a "person" acting under color of state law for purposes of 42 U.S.C. §1983.

92. DaCosta is a member of the Classified Service established by Section 6.3 of the Charter, Section 2, ¶ 12 of the CSRR, and the Progressive Discipline Policy.

93. DaCosta has a property interest in her job with the City created by her status as a member of the Classified Service, creating a legitimate expectation and right to 'just cause' employment established by the Charter, the Connecticut General Statutes, the CSRR, and the Non-Union Employees Handbook, as set fourth above.

94. DaCosta is further entitled to "just cause" termination by virtue of the Progressive Discipline Policies set forth in the NUEHB.

95. The Policy Statement Section of the NUEHB states that the Progressive Discipline Policies may be suspended only in a case of "serious rule violations or serious improper conduct."

96. This provisions of the NUEHB guarantees non-union City employees the right to these progressive discipline procedures unless the offense involves "serious rule violations or serious improper conduct."

97. The alleged harassment for which DaCosta was terminated did not involve "serious rule violations or serious improper conduct," and therefore DaCosta should have been afforded Progressive Discipline under the NEUB.

98. Sections 2.C and 2.D of the Progressive Discipline Policy specify that when Personnel is recommending any City employee for suspension or termination, they must "schedule a hearing." When DaCosta was suspended and when she was terminated she was not provided with a hearing "scheduled" by Personnel as set forth in the Progressive Discipline Policy of the NUEHB.

99. DaCosta has a right to notice and a scheduled hearing prior to termination pursuant to (a) the "just cause" guarantee in the CSRR; (b) the Progressive Disciplinary Policy incorporated into the NUEHB; and (c) the Anti-Harassment Policy incorporated in the NUEHB.

100. The City has deprived DaCosta of her job without procedural due process in that it refused to provide her notice and the scheduled hearing guaranteed in the NUEHB and further, refused to provide her with the procedures, including a scheduled hearing, to which all City employees are entitled under

the Anti-Harassment Policy which is incorporated into the NUEHB and which allegedly provided the basis of DaCosta's termination.

101. Boughton knew or should have known that terminating DaCosta for conduct that was not prohibited by the City's Anti-Harassment Policy, took place on her personal time and off City property was not "just" as required by the CSRR, the Non-Union Employees Handbook, the Anti-Harassment Policy and the Progressive Discipline Policy.

102. Boughton knew or should have known that the CSRR defines classified service to include DaCosta as set forth hereinabove.

103. Boughton knew or should have known that the Progressive Discipline Policy required a scheduled hearing prior to termination or suspension of DaCosta.

104. Boughton knew or should have known that Alosco-Werner's "investigation" into the alleged misconduct of DaCosta on August 12, 2011 consisted of evidence of  two phone calls by DaCosta to warn Iadarola of her friend's rude phone call so that he would not be alarmed.

105. Boughton knew or should have known that two phone calls from DaCosta to warn Iadarola of her friend's rude phone call so that he would not be

alarmed, during off duty hours, does not involve, "serious rule violations or serious improper conduct."

106. In 2010, when DaCosta was terminated, the law regarding sexual harassment and "just cause" termination for classified civil service employees such as DaCosta was clear and well known.

107. Boughton has without "just cause" terminated DaCosta's employment and deprived her of pay and benefits in violation of her constitutional right to due process.

108. Boughton deprived DaCosta of her job with the City without due process in that he refused to provide her fair notice and opportunity to be heard and/or to present evidence that her alleged conduct did not violate any City policy.

109. As Chief Executive, Boughton knew or should have known that terminating DaCosta for conduct that did not violate any City policy and refusing her an opportunity to challenge that dismissal was a violation of the 14th Amendment to the United States Constitution.

110. Because Boughton himself is one of the similarly situated male employees who were provided greater due process protection than DaCosta in connection with the Carol Desantie harassment complaint, it is not

reasonable for him to believe that applying the City's policies differently to DaCosta than to him and other males accused of harassment was lawful.

111. As a result of the City's actions, DaCosta has been deprived of her job, pay, benefits, and her good reputation and is entitled to compensation therefore.

112. As a result of Boughton's actions, in disregard of DaCosta's right to due process, DaCosta is entitled to a compensatory damages, punitive damages, reasonable attorneys' fees, costs, pre and post judgment interest and such further and additional relief as this court finds just and reasonable.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(42 U.S.C. §1983 Equal Protection Violation by the City Of Danbury)**

1-112. The allegations of paragraphs 1-112 of this Complaint are hereby incorporated by reference into this paragraph as if fully set forth herein.

113. The City has without "just cause" or rational basis disciplined and terminated DaCosta's employment while other similarly situated male employees accused of harassment were not terminated or similarly disciplined.

114. The City both directly and through the Mayor as final policy-maker, deprived DaCosta of the equal protection of the law in that it disciplined and

terminated her for conduct which did not violate the City's anti-harassment policy while refusing to discipline or to terminate similarly situated male employees in the Mayor's office as well as other City departments who were accused of actual violations of the anti-harassment policy.

115. The City both directly and through the Mayor as final policy-maker, deprived DaCosta of the equal protection of the law in that DaCosta was denied the protection of the Progressive Discipline Policy, (Exhibit C, "Progressive Discipline Policy" (2)(d)), which guaranteed her a hearing and equitable administration of the City's policies.

116. The similarly situated male employees who were accused of harassment by female co-workers but who were not similarly disciplined or discharged and where applicable received greater protection from the Progressive Discipline Policy, include:

        A. Mayor Mark Boughton, in that he was accused of equal or more serious violations of the City's harassment policies for conduct during work hours, by the female former Head of the City's Human Resources Department, Carol Desantie but was not similarly disciplined or terminated;

B. Scott LeRoy, a former Director of the City's Health, Housing and Welfare Department who was accused of equal or more serious violations of the City's harassment policies by one or more female employees of the City, including inappropriate, condescending, and harassing messages during work hours, but was not similarly disciplined or terminated;

C. Robert Harris, a former employee of the City's Department of Public Works who was accused of equal or more serious violations of the City's harassment policies including making threats against City officials during work hours but was not similarly disciplined or terminated for those offenses;

D. Glen Utter, a former City Police Officer who was accused of equal or more serious violations of the City's harassment policies by one or more women working with his department as a Women's Advocate for creating a threatening and hostile work environment during work hours, but was not similarly disciplined or terminated; and

E. Shaun McQuade, an officer in the Danbury Fire Department, who was accused of harassment and found to have violated the harassment policy by one of his female subordinates with whom he had a consensual personal relationship, for conduct both during and after work hours, but was not similarly disciplined or terminated and was given an opportunity for formal mediation with the complaining party.

117. The male employees of the City listed above are similarly situated to DaCosta in all material respects in that they are all subject to the City's anti-harassment policies and they were all accused of harassment which was of equal or greater severity than the harassment alleged against DaCosta.

118. The only respects in which comparators must be similarly situated is that (a) comparators must be subject to the same workplace policies and standards relevant to the conduct as DaCosta and (b) the comparators must have been accused of misconduct of an equal or more severe nature than DaCosta and still received different treatment.

119. The City's Anti-Harassment Policy was applied differently to each of these similarly situated male comparators in that:

A. The harassment complaints against the comparator were handled "off the record" and were settled informally, as in the case of the complaints against Mayor Bougton;

B. The harassing conduct alleged against the comparator was objectively more severe than DaCosta's including "stalking" of the victim, but no discipline for harassment was issued as in the case of Sean McQuade;

C. The harassing conduct alleged against the comparator included violent threats, unlike the non-threatening phone calls made by DaCosta to relieve rather than cause fear, but no termination resulted in the case of Robert Harris above.

D. The harassing conduct alleged against the comparator included conduct that caused a hostile work environment in the workplace for employees against their direct supervisor as in the case of Scott LeRoy, and no finding of harassment was made, although DaCosta was terminated for two out of work phone calls that could not possibly have caused a hostile work

environment as DaCosta had almost no interaction with
Iadarola in the workplace.

120. As a result of the City's actions, in disregard of DaCosta's rights herein, she
has been deprived of her job, pay, benefits, and her good reputation.

121. As a result of the City's actions, in disregard of DaCosta's right to the equal
protection of the  laws, DaCosta is entitled to a mandatory injunction
requiring the City to nullify the termination of her employment and reinstating
her to her prior position, compensatory damages, punitive damages,
reasonable attorneys' fees, costs, pre and post judgment interest and such
further and additional relief as this court finds just and reasonable.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(42 U.S.C. §1983 Equal Protection Violation by Mark Boughton
in his Individual Capacity)**

1-121. The allegations of paragraphs 1-121 of this Complaint are hereby
incorporated by reference into this paragraph as if fully set forth herein.

122. Boughton has without "just cause" or rational basis terminated DaCosta's
employment and deprived her of pay and benefits in violation of the Plaintiff's
constitutional rights while other similarly situated male employees were not
terminated.

123. Boughton deprived DaCosta of the equal protection of the law in that he disciplined and terminated her for alleged violations of the City's anti-harassment policy due to her gender while refusing to discipline or to discharge similarly situated male employees in the Mayor's office as well as other City departments, who were accused of similar or more serious acts of harassment.

124. Boughton knew or should have known of each of the similarly situated comparator cases set forth above and therefore, he knew or should have known that DaCosta's conduct was equal to or less severe and that DaCosta was entitled to the same application of the City's Anti-Harassment Policies as the comparator cases above.

125. Boughton deprived DaCosta of the equal protection of the law in that he applied a discriminatory policy that enforced the City's anti-harassment rules against DaCosta because she is a woman but did not enforce it against male employees in the Mayor's office as well as other City departments who were similarly situated.

126. Boughton further failed to provide DaCosta the equal protection of the law in that he failed to provide her with the procedural right to "just cause"

termination to which she was entitled under the CSRR, refused to provide

her with a scheduled hearing to which she was entitled under the

Progressive Discipline Policy and refused to provide her with the procedures

to which she was entitled under the City's Anti-Harassment policies, while the

male comparators listed above were each provided with all of the procedural

rights to which they were entitled by City policies and contracts.

127. Boughton's failure to provide DaCosta with the appropriate procedures prior

to termination while each of the similarly situated male comparators were

provided all appropriate procedures, is a failure to provide the equal

protection of the law.

128. Boughton's actions as set forth above constitute a disregard for the rights of

DaCosta to the equal protection of the laws as these rights are protected by

the Fourteenth Amendment to the United States Constitution.

129. As a result of Boughton's actions in disregard of DaCosta's rights herein,

she has been deprived of her job, pay, benefits, and her good reputation.

130. As a result of Boughton's actions, in disregard of DaCosta's right to equal

protection of the law, DaCosta is entitled to compensatory damages, punitive

damages, reasonable attorneys' fees, costs, pre and post judgment interest

and such further and additional relief as this court finds just and reasonable.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Defamation by the City of Danbury.)

1-130. The allegations of paragraphs 1-130 of this Complaint are incorporated

by reference as if fully set forth herein.

131. The City, by and through its agents, servants, and employees have made

and published unprivileged defamatory, false, and injurious statements

concerning DaCosta in her reputation, character, and conduct and shared

these statements between City employees and third parties, which exposed

DaCosta to emotional distress through hatred, contempt, aversion and/or

the unsavory opinion of the civil and professional community.

132. The Human Resources report to the Mayor dated August 17, 2011, written

by Alosco-Werner and captioned, "Recommendation for Termination-Wendy

DaCosta," "Termination Report") contains unprivileged defamatory, false,

and injurious statements concerning DaCosta in her reputation, character,

and conduct. These statements were published through the inclusion in

DaCosta's personnel file with the City and shared between City employees

and include the following:

A. The Termination Report states: "On August 29, 2008…Ms. DaCosta received another warning regarding her…failure to follow your directives regarding contacting Mr. Iadarola." This statement is factually incorrect and tends to harm DaCosta's reputation in that it suggests that the reason for the August 29, 2008 warning was DaCosta's continued contact with Iadarola, when in fact the purpose of the warning was to address DaCosta's misbehavior at a staff meeting not her contact with Iadarola. This false statement harms DaCosta's reputation with the Mayor in that it suggests that she was disciplined on that date for contact with Iadarola when in fact, she was not.

B. The Termination Report further states: "On August 29, 2008…It was clearly stated that any further inappropriate behavior or contact with Mr. Iadarola would result in her separation of employment." This statement is factually incorrect and tends to harm DaCosta's reputation because the August 28, 2008 counseling session involved alleged misbehavior at a staff meeting not her contact with Iadarola. This harmed DaCosta's reputation with the Mayor in that it suggests

that she was disciplined on that date for contact with Iadarola when in fact, she was not.

C.  The Termination Report states: "Ms. DaCosta's involvement in the threatening phone call made to Mr. Iadarola as well as her continued calls to him on this date, created a threatening and hostile environment for Mr. Iadarola." This statement is factually incorrect and falsely accuses DaCosta of participating in the threatening phone call, tending to seriously harm her character and reputation. DaCosta did not participate in or instigate a threatening phone call to Iadarola. She attempted to prevent such a call and her call to warn him could not reasonably be construed to threaten Iadarola. Its express purpose was to forewarn him and to reduce any surprise or alarm that may have resulted from an unexpected call from DaCosta's acquaintance. The statement that she was involved in a threatening phone call creates the false impression that DaCosta was violent, threatening or intimidating towards Iadarola which is false. This false impression led in part to the Mayor's decision to terminate DaCosta.

D. The Termination Report further states: "Ms. DaCosta…violated the terms of her action plan." This statement is factually incorrect and tends to harm her reputation. At the time of the termination, the prior action plan had expired by the terms of the EAP documents. Additionally, DaCosta's actions on August 12, 2011 did not in fact violate the terms of her EAP action plan. Further, the Mayor had enacted a specific policy as to DaCosta and Iadarola permitting both social contact and work-related contact between the two employees. DaCosta could not violate a policy that had been rescinded by the employer's subsequent policies and practices enacted by the Mayor. Further, this false statement harms DaCoasta's reputation in that it suggests she had an EAP action plan in place at the time and that she disregarded it when in fact there was no longer any EAP action plan in place and DaCosta did not violate anything.

E. The Termination Report further states: "Ms. DaCosta…violated the City of Danbury Anti-Harassment Policy." This statement is factually incorrect and tends to harm her reputation. The City's Anti-Harassment Policy does not contain any prohibition against the type of

out-of work conduct DaCosta engaged in on August 12, 2011. Her

conduct in warning Iadarola could not reasonably be interpreted as

hostile or harassing. This false statement harmed DaCosta's

reputation in that it creates the impression that she engaged in hostile,

threatening, or coercive conduct towards Iadarola which was false.

133. The Mayor and other town employees acting as the agents, servants and

employees of the City published these defamatory statements to third

parties, by including those false and damaging statements in DaCosta's

personnel record which is a clear publication of those statements. The

statements set forth above specifically identified DaCosta to those third

parties.

134. The defamatory statements took the form of libel in that false written

statements and/or documents were shared and published, through the

inclusion in DaCosta's personnel file with the City, since the time of

DaCosta's termination by Alosco-Werner and/or her employees

135. Additionally, false written statements were made and shared by City

employees to third parties. These false written statements are and have been

subject to publication by employees of the City, to other City employees, and have been published to third parties by inclusion in DaCosta's personnel file.

136. All of these false written statements are and have been damaging to DaCosta's personal and professional reputation.

137. All of these false spoken statements are and have been damaging to the DaCosta's personal and professional reputation.

138. The false and defamatory statements as aforesaid, have been published in DaCosta's personnel file and among and between City employees including Alosco-Werner, Mayor Boughton, and Diane Rosemark continuously since August 17, 2011.

139. The false and defamatory statements as aforesaid, have been published in DaCosta's personnel file and among and between City employees including Alosco-Werner, Mayor Boughton, and Diane Rosemark contemporaneously with DaCosta's termination on August 18, 2014.

140. The aforesaid defamatory statements were published with actual malice in that they were published with actual knowledge that they were false or with reckless disregard for whether they were false.

141. As a result of the false and defamatory statements published in her personnel file, DaCosta was terminated by Mayor Boughton on or around August 18, 2011.

142. As a result of the City's defamatory, false, malicious and injurious statements DaCosta has suffered special damages. DaCosta has suffered and will continue to suffer damage caused by defendant's illegal conduct including loss of wages and benefits and long-term economic detriment due to lost seniority, loss of status in her profession and the community and lost career options. Additionally, DaCosta has suffered an inability to mitigate her damages as a result of the defamatory statements by the City.

## AS AND FOR A SIXTH CAUSE OF ACTION
**(Violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq., against the City of Danbury for interference and retaliation)**

1-142. The allegations of paragraphs 1-142 of this Complaint are incorporated by reference as if fully set forth here.

143. Pursuant to 29 U.S.C. § 2611 (4) (A) (iii), the City is an "employer" within the meaning of the FMLA. At all relevant times, the City had control over DaCosta's right to medical leave under the FMLA.

144. DaCosta is an "eligible employee" as that term is defined in the FMLA, 29 U.S.C. § 2611(2).

145. Alosco-Werner is, and at all times material hereto, was an agent, employee and servant of the City and was acting on behalf of the City within the course and scope of her agency or employment authority and acted with the knowledge of the City.

146. On August 18, 2011, DaCosta delivered a written and signed request for medical leave for substance abuse treatment under the FMLA, 29 U.S.C. § 2601 et seq. in hand to the City's Human Resources Director, Alosco-Werner at the Danbury City Hall.

147. DaCosta's FMLA request included a signed letter from MCCA, a local addiction treatment provider, stating that she had scheduled an evaluation for substance abuse treatment.

148. On August 18, 2011, DaCosta hand-delivered her request for family medical leave to Alosco-Werner, who interfered with DaCosta's application for FMLA leave by throwing the request back at DaCosta, and subsequently failing to review it in accordance with City and FMLA policies,

as DaCosta repeatedly stated in sum and substance, "This is an FMLA leave request."

149. On August 18, 2011, the City interfered with DaCosta's right to have her position held until she returned from FMLA leave by refusing to properly consider or to process DaCosta's requested FMLA leave prior to terminating her.

150. On August 18, 2011, several hours after DaCosta delivered her request for FMLA leave by hand to Alosco-Werner, the City sent a uniformed officer from the Danbury Police Department to DaCosta's residence to deliver a letter terminating her employment with the City.

151. The City, by and through Alosco-Werner denied and/or completely ignored DaCosta's request for FMLA leave to which she was entitled.

152. The fact that DaCosta was terminated only hours after the submission of her request for FMLA leave indicates that her termination was motivated in part, by retaliatory animus in response to her request for leave. This retaliation is separate and in addition to the aforementioned interference by the City.

153. The City, by and through Alosco-Werner violated DaCosta's right to leave under the FMLA in that: (A) DaCosta's right to medical leave to seek substance abuse treatment was interfered with and impaired by Alosco-Werner's rejection of the FMLA application as aforesaid and her refusal to preserve DaCosta's position until she returned from FMLA leave; and (B) the City's termination of DaCosta only hours after her application was submitted was in retaliation for her taking or applying for FMLA leave to seek substance abuse treatment and violated her right to the same or equivalent employment after seeking leave.

154. Additionally, the City retaliated against DaCosta for seeking her FMLA rights by terminating her employment rather than preserving it.

155. DaCosta had an "entitlement to leave" pursuant to her request as defined in the FMLA, 29 U.S.C. § 2612(1), and she was denied her entitlement to leave as prescribed in the FMLA.

156. DaCosta's entitlement to leave was based upon her need for prompt treatment for substance abuse, which is a serious medical condition that made DaCosta unable to perform the functions of her position pursuant to 29 U.S.C. § 2612(1)(D).

157. The City was well aware of DaCosta's need for substance abuse treatment prior to DaCosta's FMLA request on August 18, 2011.

158. DaCosta was entitled to restoration to her position as described in the FMLA, 29 U.S.C. § 2614(1) and she was denied restoration to the same or equivalent position as prescribed in the FMLA.

159. The City is liable to DaCosta for this violation of her right to FMLA leave pursuant to, 29 U.S.C. § 2617(a).

160. As a proximate result of the City's conduct in unlawfully denying her leave pursuant to the FMLA and in retaliating against her, DaCosta was not compensated during her medical treatment, lost medical benefits during her treatment, she has been unemployed and has been and will continue to experience a loss of wages and benefits while being forced to expend significant personal sums in order to obtain reinstatement to the City position to which she is entitled.

161. As a proximate result of the City's unlawful denial of DaCosta's request for FMLA leave and because of the retaliation against her, DaCosta has incurred, and will continue to incur the following losses and damages: lost wages and medical expenses during her substance abuse treatment, back

pay and employment benefits from the effective date of termination,
medical expenses from the date of termination, the loss of front pay as of
the date of this complaint, and any interest on the amount thereon as
provided in the FMLA, 29 U.S.C. § 2617. The compensable costs also
include attorneys' fees and costs of litigation. All of these losses and
damages are compensable pursuant to the FMLA, 29 U.S.C. § 2617(a).

162. The City is liable to DaCosta for each category of damages set forth above
pursuant to the FMLA.

## AS AND FOR A SEVENTH CAUSE OF ACTION
**(Municipal Indemnification of Mayor Mark Boughton Pursuant to Conn. Gen.
Stat. § 7-465)**

1-162. The allegations of paragraphs 1-162 of this Complaint are incorporated
by reference as if fully set forth here.

163. At all times relevant, Mayor Mark Boughton was an agent, employee,
and/or a servant of the City, and was acting in the performance of his
duties on behalf of the City within the scope of his employment and
authority.

164. Pursuant to the Second and Fourth causes of action alleged hereinabove, Mayor Boughton is individually liable to DaCosta for his acts and omissions as set forth therein.

165. Pursuant to Conn. Gen. Stat. § 7-465 the City is liable to pay all sums which Mayor Boughton shall become obligated to pay by reason of the liability imposed upon him pursuant to the aforesaid causes of action.

<u>**AS AND FOR AN EIGHTH CAUSE OF ACTION**</u>
**(42 U.S.C. §1983 Due Process – Stigma Plus Violation by the City Of Danbury.)**

1-165. The allegations of paragraphs 1-165 of this Complaint are hereby incorporated by reference as if fully set forth herein.

166. DaCosta has a liberty interest in her reputation.

167. The City has injured the plaintiff's reputation and deprived her of her protected property right in her employment.

168. The City has deprived the Plaintiff of her liberty interest in her reputation and her property interest in her employment by making stigmatizing statements through publication in her personnel file, and to other City employees, including Mayor Boughton, Alosco-Werner, and Diane Rosemark.

169. The aforesaid stigmatizing statements, including those contained in the Termination Report published in DaCosta's personnel file and statements made by Michael Rose, Mayor Boughton, and other City employees to the press and third parties, called into question the Plaintiff's good name, reputation, honor, and integrity and have impugned the Plaintiff's professional reputation and in such a fashion as to impair her ability to practice her profession as a municipal administrative assistant. These false statements entered into DaCosta's personnel file seriously threaten DaCosta's reputation in that they state that DaCosta was involved in a threatening phone call to Iadarola when in fact, she was not involved and instead sought to prevent the calls and any impression they might make on Iadarola. Further, the false statements in her personnel file indicate that DaCosta was harassing Iadarola when in fact she had not harassed him. The aforesaid stigmatizing statements were published in DaCosta's personnel file and to certain City employees as aforesaid, contemporaneously with the Plaintiff's termination from her City job.

170. As a result of the City's actions, in disregard of DaCosta's rights, she has been deprived of her job, pay, benefits, her ability to obtain comparable

employment in her field and the loss of her good reputation.

171. DaCosta is entitled to an opportunity to refute the charge against her and to clear her name.

WHEREFORE, the Plaintiff claims:

  A. A Permanent Injunction ordering the Defendant City of Danbury to reinstate DaCosta to her previous position with compensation for lost pay, benefits and seniority;

  B. Compensatory damages for emotional distress, damage to her reputation and professional standing;

  C. Punitive damages against Mayor Mark Boughton in his individual capacity;

  D. Compensatory damages pursuant to FMLA 29 U.S.C. § 2601 *et seq.* for all past, present and future lost wages and employment benefits;

  E. Reasonable attorney's fees pursuant to the FMLA, 29 U.S.C. § 2617(a);

  F. Attorney's fees pursuant to 42 U.S.C. §1988;

  G. Costs, statutory interest and any further relief that the Court deems fair, just and equitable; and

  H. An order that the Plaintiff is entitled to a name-clearing hearing to refute the untrue and damaging accusations against her.

Dated: October 2, 2014.

PLAINTIFF,

Wendy DaCosta


By: _____/S/_____
Elisabeth Seieroe Maurer
Maurer & Associates, PC
Attorney for Plaintiffs
871 Ethan Allen Hwy, Suite 202
Ridgefield, CT 06877
Phone: (203) 438-1388
Fax: (203) 431-0357
emaurer@maurerandassociates.com

## **CERTIFICATION**

This is to certify that a copy of the foregoing was filed electronically on this October 2, 2014. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

_____/s/_____
Elisabeth Seieroe Maurer